**EMPLOYERS REINSURANCE CORPORATION, Appellant**

v.

**AMERICAN SOUTHWEST INSURANCE MANAGERS, INC., Appellee.**

No. 05–06–01284–CV.

Court of Appeals of Texas, Dallas.

Aug. 14, 2008.

Moore is not the prevailing party because he did not prevail on the main issue—the termination of the lease.

W. Neil Rambin, S. Vance Wittie, Lisa Marie Henderson, Sedgwick, Detert, Morgan, & Arnold, LLP, Dallas, TX, for Appellant.

Anthony Icenogle, DeLeon & Boggins, P.C., Austin, TX, for Appellee.

Before Justices MOSELEY, O'NEILL, and FITZGERALD.

## OPINION

Opinion by Justice MOSELEY.

This is a contract case involving two contracts: a reinsurance agreement between Employers Reinsurance Corporation ("ERC") and American Southwest Insurance Managers, Inc. ("American Southwest"); and an administrative services agreement between ERC, American Southwest, and one of American Southwest's divisions, Statewide Claims Service, Inc. ("SCS"). American Southwest sued ERC for commissions allegedly owed pursuant to the reinsurance agreement.

ERC answered and filed a counterclaim to recover overpaid commissions.

The parties' dispute concerns a contract construction issue: whether a $1,300,000 "Claims Start Up Fee" paid to SCS by ERC pursuant to the administrative services agreement should be included in calculating ERC's "losses incurred" under the reinsurance agreement. Both parties moved for partial summary judgment based on their respective arguments as to how the contracts should be construed. The trial court concluded the "Claims Start Up Fee" should not be included in calculating losses incurred under the reinsurance agreement, and thus granted American Southwest's motion and denied ERC's. After an evidentiary hearing on damages, the trial court rendered a final judgment for American Southwest for $9,495.92, plus attorneys' fees and interest.

ERC appeals and in two issues contends the trial court erred in granting partial summary judgment for American Southwest and in denying ERC's motion for partial summary judgment. *See Webb v. Jorns*, 488 S.W.2d 407, 409 (Tex.1972) (interlocutory judgment merges into final judgment and becomes final for purposes of appeal). For the following reasons, we reverse the trial court's judgment, render judgment in part, and remand the case to the trial court for further proceedings.

## BACKGROUND

American Southwest is a managing general agency managing automobile insurance programs. In 1993, American Southwest entered into a reinsurance agreement ("Reinsurance Agreement") with ERC's predecessor-in-interest, Vesta Fire Insurance Corporation. (The parties sometimes referred to the Reinsurance Agreement as a "Treaty.") In 1999, ERC assumed Vesta Fire's portfolio and its responsibilities to American Southwest under the Reinsurance Agreement.

Under the Reinsurance Agreement, American Southwest received a provisional commission on the net premium to be paid by Vesta (later, ERC). The provisional commission was adjusted each December 31 based on the ratio of "losses incurred" to earned premiums for the period. The adjusted commission rate varied based on the ratio; the lower the ratio, the higher American Southwest's adjusted commission rate would be. The Reinsurance Agreement defined "losses incurred" as including

> all ceded losses and *loss adjustment expenses paid* as of the effective date of the calculation, plus the ceded reserves for losses and *loss adjustment expenses outstanding* as of the same date.

(Emphasis added.) If the adjusted commission was less than the provisional commission already paid, American Southwest would repay the difference to Vesta (later, ERC). Alternatively, if the adjusted commission was greater than the provisional commission already paid, Vesta (later, ERC) would pay the difference to American Southwest.

In 1996, the provisional commission rate in the Reinsurance Agreement was lowered from 30.5% to 27.5%. As a result, American Southwest's provisional commission exceeded its adjusted commission for that year. To reimburse that overpayment, American Southwest wire transferred $1,308,402.37 to Vesta, ERC's predecessor.

Also in 1996, Vesta entered into the Administrative Services Agreement with American Southwest and SCS. Under this agreement, SCS agreed to provide loss adjustment services to Vesta (later, ERC) in return for "5.5% of Net Premium Earned from business produced by [Amer-

ican Southwest] and reinsured by Vesta under said Treaty."

In 1997, the Administrative Services Agreement was amended to change SCS's compensation under that agreement. Specifically, paragraph 4 of that agreement was amended to read

> 4. SCS's sole compensation for performance under this Agreement shall be 7.5% of Net Premium Earned from business produced by [American Southwest] and reinsured by Vesta [later ERC] under said Treaty. The amount so calculated shall be adjudged as full and complete payment for all services under this Agreement, including but not limited to salaries, supplies, office expense, retention and use of outside adjustment or appraisal services, and any other cost of administration of losses, save legal expense to outside attorneys.

> As additional compensation Vesta [later ERC] shall remit a Claims Start Up Fee of $1,300,000.00 to SCS. Such Fee shall be paid on a monthly basis, with installments of $150,000.00 payable 1/1/97 and 2/1/97 and installments of $100,000.00 due the first of each month for the remainder of the year with the last installment being 12/1/97.

(Brackets added.) The effect of the 1996 change in the Reinsurance Agreement and the 1997 amendment to the Administrative Services Agreement was to reduce the commissions paid to American Southwest under the Reinsurance Agreement and increase the compensation paid to its affiliate, SCS, under the Administrative Services Agreement.[1]

As noted above, the dispute in this case is whether the Claims Start Up Fee ("Fee") in the Administrative Services Agreement constitutes a "loss adjustment expense" (either paid or outstanding) under the Reinsurance Agreement, and thus whether it should be included in calculating "losses incurred" under the Reinsurance Agreement. Both American Southwest and ERC initially treated the Fee as a loss adjustment expense when computing the losses incurred in calculating the 1997 adjusted commission. In 1999, however, American Southwest took the position that the Fee did not fall under the definition of losses incurred under the Reinsurance Agreement and removed the Fee from its 1997 adjusted commission calculations. American Southwest also asserted that ERC improperly failed to include the 1996 wire transfer as a debit payment in its adjusted commission calculations.

In 2005, American Southwest sued ERC for unpaid commissions for 1997, and ERC counterclaimed to recover overpaid commissions for the same year. Both parties moved for partial summary judgment. The trial court granted American Southwest's motion and denied ERC's, finding that the Fee should not be included in calculating "losses incurred" under the Reinsurance Agreement.

## STANDARD OF REVIEW AND APPLICABLE LAW

The standards for reviewing summary judgments are well established, and we follow them in reviewing this appeal. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985) (summary judgment standards of review). When both parties move for summary judgment, each

---

1. The summary judgment evidence includes a 2003 letter from American Southwest to ERC. The letter states that the 1997 amendment to the Administrative Services Agreement was part of an effort by American Southwest to avoid a tax liability by shifting income from commissions earned from its general managing agent function (performed by American Southwest) to fees earned through its loss adjusting function (performed by its subsidiary, SCS).

party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000). When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both parties and determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered or reverse and remand if neither party has met its summary judgment burden. *Id.; Al's Formal Wear of Houston, Inc. v. Sun,* 869 S.W.2d 442, 444 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

■ In construing a written contract, we must ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam); *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank,* 165 S.W.3d at 312; *Webster,* 128 S.W.3d at 229. "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Webster,* 128 S.W.3d at 229. Additionally, courts construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive. *Frost Nat'l Bank,* 165 S.W.3d at 311; *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987).

■ If after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous, and we construe the contract as a matter of law. *Frost Nat'l Bank,* 165 S.W.3d at 312.

### DISCUSSION

■ Both parties assert that the contracts are unambiguous and we agree. Thus, we construe them as a matter of law. *See id.* ERC claims the Fee is compensation for loss adjustment services provided by SCS and therefore is a "loss adjustment expense" that should be included in calculating "losses incurred" under the Reinsurance Agreement. American Southwest contends that the addendum to the Administrative Services Agreement explicitly states that SCS's "sole compensation for performance" is the 7.5% commission; thus, the "additional compensation" of the $1,300,000 Claims Start Up Fee is not a loss adjustment expense[2] as a matter of law, and therefore should be excluded when computing "losses incurred" under the Reinsurance Agreement.

The parties entered into the Administrative Services Agreement for the sole purpose of SCS providing loss adjustment services. As consideration for that agreement, as amended in 1997, ERC agreed to pay SCS: (a) 7.5% of Net Premium Earned; and (b) the Claims Start Up Fee. Thus the Fee is part of ERC's expenses paid to obtain loss adjustment services from SCS. In other words, it is a "loss adjustment expense"—either paid or outstanding—of ERC under the Reinsurance Agreement.

American Southwest asserts that the Claims Start Up Fee is not a "loss adjustment expense" under the Reinsurance

**2.** ERC does not contend the Fee falls under any other definition of losses incurred under the Reinsurance Agreement

Agreement because the Administrative Services Agreement provides that: (a) the 7.5 % of Net Premium payment is "SCS's sole compensation for performance" under that agreement; and (b) the Fee is referred to as "additional compensation." However, the unambiguous terms of the agreement support American Southwest's argument. Even though SCS's "sole compensation for performance" is 7.5% of Net Premium Earned, it is undisputed that SCS was also is entitled to—and was paid—$1.3 million as "additional compensation" under the Administrative Services Agreement. Although one payment was for "performance" under the Administrative Services Agreement and the other was for "additional compensation" under the Administrative Services Agreement, both constituted consideration paid by ERC or its predecessor for the Administrative Services Agreement itself. It is this characteristic that makes both payments an expense of ERC or its predecessor in entering into the Administrative Services Agreement. Further, the only benefits obtained by ERC or its predecessor through the Administrative Services Agreement are "loss adjustment services." Thus, both payments, one for "performance" and one denominated as a "Claims Start Up Fee" and paid as "additional compensation" are "loss adjustment expenses" within the meaning of the Reinsurance Agreement. As a result, the Claims Start Up Fee should be included in calculating "losses incurred" under Reinsurance Agreement.

American Southwest further argues that ERC cannot include the Claims Start Up Fee in calculating losses incurred under the Reinsurance Agreement without also giving credit to American Southwest for the wire transfer payment. However, although the amount of the wire transfer and the Fee are similar, the summary judgment record indicates that they are two unrelated, distinct payments.

The wire transfer from American Southwest reimbursed ERC's predecessor for its overpayment of provisional commissions for 1996, which resulted when the parties amended the Reinsurance Agreement to lower the provisional commission payment. American Southwest had received provisional payment according to the higher rate and was required to pay back the excess, which it did through the wire transfer. The Fee, on the other hand, was paid to SCS by ERC's predecessor in partial consideration for the Administrative Services Agreement, under which it obtained—and obtained only—loss adjustment services.

Although American Southwest asserts it is undisputed that ERC did not factor the 1996 wire transfer into its 1997 calculations, it points to no evidence—and we have found none—supporting the proposition that the wire transfer *should* be factored into those calculations. The 1996 wire transfer related to the payment of *commissions*, not loss adjustment expenses, and thus did not affect the calculation of "losses incurred." On the other hand, and as discussed above, the Claims Start Up Fee paid to SCS was a *loss adjustment expense*, and thus did affect the calculation of "losses incurred."

Morover, the 1996 wire transfer was necessitated by an amendment to the Reinsurance Agreement made in 1996, before the Administrative Services Agreement was amended in 1997 to include the Fee. Further, the Fee was payable in twelve installments over the course of 1997, while the wire transfer was paid in one lump sum, further indicating the payments are distinct. Thus, we reject American Southwest's argument.

Considering the summary judgment evidence and the clear language of the agree-

ments, we conclude the Fee was paid in consideration for the Administrative Services Agreement, through which ERC or its successor obtained loss adjustment services from SCS. Therefore, it constitutes a "loss adjustment expense" under the meaning of the Reinsurance Agreement, and should be included in calculating "losses incurred" under that agreement. Thus, the trial court erred in granting American Southwest's motion for partial summary judgment and denying ERC's motion.

We sustain ERC's first and second issues. We reverse the trial court's judgment in favor of American Southwest and render partial summary judgment in favor of ERC that the Fee constitutes a "loss adjustment expense" and thus is included in calculating "losses incurred" under the Reinsurance Agreement. We remand this cause to the trial court for further proceedings.